CLÍNICA DR. MARIO JULIÁ, INC., Plaintiff, Appellant and Appellee, *v.* SECRETARY OF THE TREASURY, Defendant, Appellee and Appellant.

No. 11063. Argued March 3, 1954.—Decided May 17, 1954.

---

*Lino J. Saldaña, Luis F. Sánchez Vilella, C. Morales, Jr.,* and *Sarah Torres Peralta* for appellants-appellee. *José Trías Monge, Attorney General,* and *J. C. Santiago Matos, Assistant Attorney General,* for appellee-appellant.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

On September 14, 1951, the Secretary of the Treasury determined and notified the Clínica Dr. Mario Juliá, Inc. certain deficiencies in the income tax paid, or to be paid, by plaintiff clinic during the taxable years 1943 to 1948 inclusive. The deficiencies thus notified, which involve the sum of $107,927.25 plus interest thereon, refer to the following deductions which were disallowed by the defendant Secretary of the Treasury:

(1) Expenses incurred in salaries and compensation to four physicians who rendered services to plaintiff taxpayer and five other employees of plaintiff. Defendant's contention was and is that such expenses were not deductible, since they had not been actually paid to the physicians and employees within each taxable year in which claim for such deductions is made by plaintiff.

(2) Part of the salaries of $32,000 annually accrued and paid in 1947 and 1948 to Dr. Mario Juliá for services rendered as medical director of the clinic operated by plaintiff for the treatment of mental patients. These deductions were disallowed by the defendant on the ground that that part of the salaries evidently was an excessive compensation, which was not reasonably commensurate with the value of Dr. Julia's services.

(3) Interest accrued and paid in 1946, 1947, and 1948 by plaintiff to the trustee of certain trusts set up by Dr. Mario Juliá and his wife for the benefit of their children.

(4) Other items which are not involved in this appeal.

In an action brought by the Clínica Mario Juliá, Inc. challenging the deficiencies determined by the Secretary of the Treasury, the San Juan Part of the Superior Court rendered judgment from which both parties have appealed to this Court. The judgment appealed from contains several pronouncements which will be discussed separately in the course of this opinion.

■ Regarding the first item above-mentioned, involving the payments to four physicians and other employees of plaintiff, the lower court held that they were not deductible in the respective taxable years claimed by plaintiff, since, even assuming that such expenses were incurred by plaintiff on the accrual method of accounting employed by it, in each of the taxable years involved, the salaries and compensations disallowed were not actually paid to those physicians and employees during the taxable year in which deduction is claimed by plaintiff. Therefore, under § 32(a)(1) of our Income Tax Act (Act No. 74 of August 20, 1925, Sess. Laws, p. 400), as amended by Act No. 159 of May 13, 1941 (Sess. Laws, p. 972), such expenses were not deductible. That pronouncement has been challenged by the taxpayer in this Court.

From the evidence presented and the findings of fact made by the San Juan Court it appears that the taxpayer kept its books on the accrual-basis, but the physicians and employees in question employed the cash-basis system, and that such physicians and employees earned monthly salaries which were credited at the end of each month to their own personal accounts kept in the books of the entity; further, that they received bonuses which were determined and approved before the end of each taxable year, and that such physicians and employees were authorized to draw on those personal accounts and to withdraw any part of those salaries during the taxable year. According to the professional-service contracts

entered into by plaintiff and the four physicians, from July 1, 1946 to December 31, 1948 the physicians had the right to withdraw monthly, chargeable to their annual compensation, up to a maximum amount of $600, and each one had the right to receive as total annual compensation one-fourth of 45 per cent of plaintiff corporation's net income. At the end of each month the amount of $600 was credited to each physician's personal account, and before the end of each year they computed the additional compensation corresponding to each of the four physicians as their share of plaintiff's net income for the year. Those amounts were also credited in each physician's personal account, on which they could draw freely. As a matter of fact, the physicians and employees did not actually receive within each taxable year certain amounts of the compensation to which they were entitled, but did receive them in subsequent years. The sums involved herein, which constitute the deductions claimed, were not actually paid in cash to the physicians and employees during each taxable year in which each deduction is claimed by plaintiff, although the obligation to make those payments was incurred by plaintiff during each of those years. As a matter of fact, the sums herein involved were actually paid during the taxable years subsequent to the year in which deduction is claimed and in which the obligation was incurred. It was finally established that the physicians and employees did not own, either individually or jointly, more than 50 per cent of plaintiff's stock, and that plaintiff had in each year sufficient economic resources to defray all expenses involved in this action.

Section 32 (a) (1) of the Income Tax Act provides that, in computing the net income of a corporation or partnership, there shall be allowed as deductions "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . *Provided*, That such expenses, salaries, rentals and payments *shall not be de-*

*ductible if they are not actually paid during the taxable year,* or if, under the accounting system used by the person to whom such payments are to be made, the amount thereof has not been included in his gross income during the taxable year, unless the same has been actually paid. *Provided, further,* That such payments or expenses shall be deductible only if it should be verified to the entire satisfaction of the Treasurer that the same are reasonable in so far as concerns those cases where the corporation or partnership making such payments or expenses own more than fifty per cent of the outstanding stock or of the social capital of the corporation or partnership, respectively, receiving such payments, or if the corporation or partnership receiving such payments owns more than fifty per cent of the outstanding stock or of the social capital of the corporation or partnership, respectively, making such payments or incurring such expenses, or if the person who receives such payments from the corporation or partnership on account of expenses owns more than fifty per cent of the oustanding stock or the social capital of the corporation or partnership, respectively, which makes such payments."

In the light of the first proviso quoted above, it is clear that the Legislature has provided that an expense shall not be deductible in those cases in which the taxpayer involved uses the accrual system, if (1) the expense has not been actually paid within the corresponding taxable year, and (2) if the person who is to receive the payment uses the cash-basis system. All these conditions have been met in this case and, therefore, the items in question are nondeductible. The taxpayer who incurred the expenses uses the accrual-basis system; the persons supposedly receiving the payments used the cash-basis system and, although those persons or employees were entitled to receive the payments in each taxable year in which the obligation for such payments was

incurred, still, the expenses were not actually paid to them during the corresponding taxable years.

■■ The taxpayer contends that the first proviso above discussed should be read together with the second and last proviso, which the taxpayer alleges establishes an additional condition to render the items nondeductible, a condition which has not been met here. The taxpayer argues that the legislative intent, although improperly drafted, was to provide in the second and last proviso that certain expenses of a corporation shall not be deductible, if they are not actually paid, unless the person who is to receive the payments from the corporation owns or controls more than 50 per cent of the stock of the corporation, which is not the case here. The taxpayer contends that the literal words of the statute should give way and be subordinate to the essential desideratum of carrying out the legislative intent. The taxpayer further contends that our § 32 (a) (1) was patterned after § 24 (c) of the Federal Income Tax Act, as amended in 1937, and that under § 24 (c) of the Federal Act the expenses incurred and not paid shall not be deductible unless there exists the relationship of ownership or control of the corporation.

We might agree with the taxpayer if § 24 (c) of the Federal Act had been substantially though not literally incorporated into our statute. That section provides as follows:

"Unpaid Expenses and Interest.—In computing net income no deduction shall be allowed in respect of expenses incurred under § 23 (a) or interest accrued under § 23 (b) :

"(1) If not paid within the taxable year or within two and one half months after the close thereof; and

"(2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and

"(3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both

the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under § 24(b)." (Relationship of "control".)

Section 24(c) provides, briefly, the following (25 *Taxes, The Tax Magazine*, 637):

No deduction shall be allowed (1) if payment is not made within the taxable year or within two and one half months thereafter; (2) if the creditor uses the cash-basis system; and (3) *if the relationship of ownership or control of more than 50 per cent of the stock is present.*

The purpose of that provision was to prevent the evasion of tax payment since, prior to the enactment of that provision, in those cases in which the creditor or employee of a corporation controlled a majority of the stock, the creditor or employee and the corporation could artificially cause the obligation to appear on the corporation books as incurred in the taxable year most favorable to the corporation, and to postpone artificially the payment to the creditor or employee until the taxable year which was most favorable to the creditor or employee, and it was intended by § 24(c) to prevent the continuance of that practice. Seidman's, *Legislative History of Federal Income Tax Laws*, p. 202; Mertens, *Law of Federal Income Taxation*, vol. 4, § 25.10, p. 325; *P. G. Lake Inc.*, 4 T. C. 1, 3, affirmed in 148 F. 2d 898; 2 Tax L. Rev. 284; 25 *Taxes* 137; 25 *Taxes* 637. In view of the legislative purpose and of the express wording of § 24(c), the three conditions must coexist; in other words, the creditor or employee must be on the accrual basis, payment should have been made within the taxable year, and the relationship of ownership or control of a majority of the stock must be present. *Michael Flynn Manufacturing Co.* v. *Comm.*, 3 T. C. 932, 936; *P. G. Lake Inc.*, *supra*; *Fincher Motors Inc.*, 43 B.T.A. 673; *Ohio Battery & Ignition Co.*, 5 T. C. 283; 25 *Taxes* 637. Precisely the factor *sine qua non* should be the control of a majority of the stock, since without this con-

trol the chances of handling the payments for the purpose of tax evasion would be substantially reduced.

If our § 32 (a) (1) would have corresponded substantially, although not in precise language, with § 24 (c) of the Federal Act, the solution of the problem would be simple. If, for example, after the first proviso, relating to the need of actual payment within the taxable year, a second proviso would have been added providing that the payments shall not be deductible if made by a corporation to a person or employee controlling a majority of the stock, there would have been margin to conclude that such a condition was additional to the others, and that the second proviso was equivalent to the conjunction "and" employed in the federal statute, since a proviso should be interpreted in connection with other provisos in the same section for the purpose of carrying out the legislative intent which may arise from the entire section. Sutherland, *Statutory Construction*, vol. 2, p. 469 *et seq.*, § § 4932 to 4934; 82 C.J.S. 884 *et seq.*, § 381. However, the second proviso in dispute is a complete departure from § 24 (c) of the Federal Act. It provides that the expenses incurred by a corporation in respect to a person or employee having the ownership of a majority of the stock shall be deductible only if such expenses are reasonable. Assuming that the expenses are reasonable—in this case there is no controversy as to their reasonableness in respect to the four physicians and employees—such expenses are deductible even if the relationship of control is present. The federal statute provides categorically that the fact of the relationship of control of the stock (provided the other conditions are met) implies that the expenses are nondeductible. Our statute provides, adversely and antagonistically to the federal statute, that the expenses are deductible even if the control of the stock is present, provided they are reasonable.

Naturally, the provision under discussion tends to annul and thwart the legislative purpose embodied in the federal

statute of obstructing tax evasion through the artificial handling of the payments. In the context of § 24 (c) of the Federal Act, such purpose is operative and effective only if the control relationship is present. But if our Legislature elected not to adopt the federal legislative intent, and decided that the expenses could be deductible irrespective of the control relationship, provided they are reasonable, it is not our function to set aside such a decision judicially.

■ Analyzing more fully the categories of legislative and judicial powers in peculiar situation such as the one presented here, in which a part of a federal section is adopted and the rationale of that first part, which served as inspiration to the federal legislature, is forthwith eliminated, it is true that the courts generally may avoid an exactly literal interpretation that may lead to an unreasonable and absurd result. *Lozada* v. *Antonio Roig, Sucrs.*, 73 P.R.R. 255; *People* v. *Mantilla*, 71 P.R.R. 35; *Rivera* v. *Quiñones*, 70 P.R.R. 297; *People* v. *De Jesús*, 70 P.R.R. 36; Mertens, *op. cit.*, vol. 1, pp. 61, 63, § 3.04. On the other hand, the literal interpretation may be ignored by the courts only if it is clearly contrary to the real intent or legislative purpose, as such purpose or intent may arise from the statute as a whole, or from the section involved as a whole. Mertens, *op. cit.*, vol. 1, p. 62. For example, this Court has refused to impart effectiveness to a literal provision of the Income Tax Act when it is repugnant to or incompatible with another general provision of the same Act which is expressive of the real legislative intent. *Roig Commercial Bank* v. *Buscaglia, Treas.*, 74 P.R.R. 919, 929.

But those are cases which deal with internal contradictions in the statute itself, where it is the duty of the courts to resolve those contradictions with a view to determining the legislature's genuine intent. That purpose belongs not to the judge but to the legislature, as it may arise from the statute itself. The judge is an interpreter and not a creator. His

power of construction acquires relevance when several probable meanings arise from the statute which furnish an adequate margin for judicial selection, but if the language is so unequivocal as to suggest only one meaning, a full sense of judicial humility and self-discipline requires the application of the legislative will. Frankfurter, "Some Reflections on the Reading of Statutes", 47 Col. L. Rev. 527; 1 Mertens 59. That is a rule of judicial honor. Mertens, *op. cit.*, vol. 1, p. 63. This Court has already stated that if the wording of a section of the Income Tax Act, relative to interest deduction, is unequivocal, the courts cannot supply omissions since such action transcends the judicial function. *Community of the Heirs of Fajardo* v. *Tax Court*, 73 P.R.R. 499. In *Crooks* v. *Harrelson*, 282 U. S. 55, the Supreme Court of the United States said:

"Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter . . . It is not enough merely that hard . . or absurd consequences . . . are produced `by an .act of legislation . . . But in such case the remedy lies with the law making authority, and not with the courts. . . ."

In *Haggar Co.* v. *Helvering*, 308 U. S. 389, it is said:

"All statutes must be construed in the light of their purpose. A literal reading of them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose."

With respect to the problem raised here, we cannot agree with the taxpayer that the second proviso under consideration must be construed contrary to what it expressly says, namely, as providing that the expenses shall not be deductible

if the relationship of the control of stock is present, or that such a relationship is a condition precedent to the disallowance of the deduction, where the proviso expressly and unequivocally provides that the reasonable expenses shall be deductible even if the control relationship is present. This is not a case of contradiction between different parts of the Act or of a section wherein the trier may choose that part expressive of the legislative intent, nor of a grammatical error, nor the undue use of a conjunction, in which case the court could impart effectiveness to the legislative intent to avoid absurd consequences. Nowhere in the Act was it shown that it was the legislative intent to disallow a deduction for reasonable expenses where the relationship of control of a corporation's stock is present. The result of the second proviso might be peculiar, but such peculiarity is a question for the lawmaker and not for the courts.

■■■■ It could be argued that the first proviso to the effect that the expenses which are not actually paid within the taxable year are not deductible, is without rationale if the condition of relationship of control of the stock is eliminated and that, therefore, in eliminating the basis of the structure, the first proviso would be left in a vacuum to the point of being ignored and considered nonexistent. But, in the first place, we must not wipe out judicially a legislative provision unless it is shown that it is contrary to the legislative purpose. In the second place, there might be a genuine explanation for leaving untouched the provision, treated singly, that no deduction shall be allowed to a taxpayer who uses the accrual method for expenses not actually paid during the taxable year of accrual of the obligation. A deduction is a legislative grace and a privilege that can be withdrawn by the legislature. *Cittadini* v. *Commissioner of Internal Revenue*, 139 F. 2d 29. From the legislature's absolute power to disallow the deduction flows the incidental power to grant it, subject to the limitations and restrictions which it may deem

advisable to impose. Whether a certain limitation is just or unjust, reasonable or unreasonable, is a question for the legislature and not for the courts. In this case the legislature has provided that, irrespective of whether or not the relationship of control is present, a deduction shall be allowed for expenses incurred only if they are actually paid during the corresponding taxable year. That deduction has been allowed subject to that specific limitation. The purpose, therefore, is not aimed at preventing tax evasion but rather to allow a deduction subject to a specific limitation. If such action is prejudicial to taxpayers on the accrual basis, or if it reduces the efficacy of the accrual method in itself, as contended by plaintiff, it is a question for the Legislature. Indeed, this Court cannot, on the basis of those considerations, eliminate judicially the limitation on the deduction of expenses. From the point of view of the purpose to prevent tax evasion, the first proviso, taken singly, may be in a vacuum. But from the point of view of the purpose to establish a limitation on deductions, the first proviso has legal effectiveness.

The taxpayer contends that, although the physicians and employees who used the cash-basis method did not actually receive the payments, they had in the taxable year of accrual of the obligation the absolute and unconditional power to receive such payments and to withdraw and obtain the sums involved when they so desired, within that taxable year, and that the existence of such power was the equivalent of a constructive payment, even if such power was not exercised. *Rubert* v. *Tax Court*, 74 P.R.R. 48, 63. The taxpayer therefore alleges that the condition of payment provided by § 32 (a) (1) was met. It has been seen that § 24 (c) of the Federal Income Tax Act requires that the sums of money involved in the expenses in the taxable year of accrual of the obligation shall have been paid. In the light of this provision, a controversy has been posed as to whether the constructive

490

payment meets the requirements of that section. 2 Tax.L. Rev. 284; 25 *Taxes* 137: "Confusion in 24 (c)"; and 25 *Taxes* 637. However, under our § 32 (a) (1) there is no margin for such a controversy. The Federal Act requires that the expenses shall have been *paid*. Our Act goes farther and specifically requires that the expenses shall have been *actually* paid. Such an addition is clearly indicative of our legislature's intent to require that the payment be effective, actual, concrete, and real. Constructive payment does not meet this requirement.

 The lower court acted correctly in disallowing the deductions in respect of the compensation of the physicians and employees for the taxable year in which the obligation of the taxpayer to pay such compensation was incurred. But the trial court allowed such deductions in the years subsequent to that in which the compensation was actually paid. The Secretary of the Treasury has appealed to us from that pronouncement alleging, briefly, that under § 32 (a) (1) the deduction for payment made by a taxpayer on the accrual basis may be allowed only if the payments are actually made in the year of accrual of the obligation, and that the deduction does not lie if the actual payments are made in years subsequent to the taxable year of accrual of the obligation.

As pivotal point around which the discussion of this problem turns, it is necessary to make reference anew to § 24 (c) of the Federal Income Tax Act, as amended in 1937. It has been seen that this section provides, substantially, that in computing the net income no deduction shall be allowed to expenses *incurred*, if they are not paid *within the taxable year* or within 2½ months thereafter, if the employee or creditor who is to receive the payments uses the cash basis, and if the relationship of control is present. It has been indicated that, *if we were to adopt a strict interpretation* of such provisions of the federal statute, if a deduction is not allowed in the year of accrual of the obligation on the ground

that payment was not made during that year (assuming a relationship of control), the deduction could not be allowed in any other subsequent year in which payment is made and the deduction might be forever lost. 4 Mertens, *op. cit.*, pp. 534, 535, § 26.10, footnote 12; 2 Tax.L.Rev. 137. Section 24 (c) refers exclusively to expenses incurred. In requiring, as a condition precedent to the allowance of a deduction, that the expenses *incurred* be paid *during the taxable year*, or within 2½ months thereafter, the federal statute refers to the taxable year in which the expenses shall have been incurred. In other words, it is provided substantially that a deduction will lie only if the payments are made within the taxable year in which the obligation accrued, or within 2½ months thereafter, and that the deduction will not lie in years subsequent to the year of accrual of the obligation, irrespective of whether the payments have been made in those subsequent years. The key to the solution of the problem consists in determining the identity of the taxable year. Considering the clause relating to "taxable year" in connection with the previous general clause relating to "expenses incurred", there expressly arises the total expression "taxable year in which the expenses have been incurred" as determinative of the year in which the deduction should be allowed.

As has been seen, our § 32 (a) (1) differs in some aspects from § 24 (c) of the Federal Act. As respects the question at issue, § 32 (a) (1) provides that there shall be admitted as deductions "all the ordinary and necessary expenses *paid or incurred during the taxable year* . . . *Provided*, that such expenses, salaries, rentals and payments shall not be deductible *if they are not actually paid during the taxable year*." (Italics ours.) Our § 32 (a) (1) does not refer exclusively to expenses incurred, as does the Federal Act, but it establishes an alternative—expenses incurred or expenses paid during the taxable year. From this alternative it appears that the "taxable year" in which a deduction may be

allowed for payments actually made during that year is not necessarily the taxable year of accrual of the obligation, but that it may also be the taxable year in which the expenses are paid. Such interpretation is consistent with the purpose of § 32(a)(1), which is not to obstruct income-tax evasions, but to limit the deduction to those cases in which the expenses are actually paid. Deduction is a function of actual payment, and should adhere to the date actual payment is made. It has been seen that, notwithstanding the fact that the obligation has been incurred in a given year, if actual payment is not made in that year the deduction does not lie. The relevant condition is the actual payment and not the act of incurring the obligation to pay. The legislative intent is to ignore the fact that the taxpayer is on the accrual basis, if the payments are not actually made. Conversely, the accrual method should be disregarded for the purpose of allowing a deduction in the year when actual payment is made. If the fact that the obligation has been incurred in a given year does not serve as an obstacle to the disallowance of the deduction, if the expense was not actually paid in that year, it should not serve either as an obstacle to the allowance of the deduction when the actual payment is made. The important thing is not the accrual method but the fact of actual payment. That theory serves as a genuine explanation of the action of our legislature in departing from the federal criterion of identifying the taxable year with the year of accrual of the obligation, and in establishing the alternative of "expenses paid", namely, the taxable year in which the obligation is paid.

The defendant contends that the pronouncement of the trial court under discussion destroys the efficacy and rationale of the accrual method. But we have already seen, in holding that the expenses were not deductible in the year of accrual of the obligation if they were not actually paid, that such a result could affect adversely the accrual method, which

is a question for the legislature. The essential point is that the legislature wished to emphasize the fact of actual payment, the accounting method being subordinate. The same criterion applies to the inverse case now under consideration, in which the trial court acted correctly in allowing deductions in the years the expenses were actually paid, irrespective of the year of accrual of the obligation and of the accrual method used by the taxpayer. We cannot place ourselves in a position of imputing to the legislature the intention of denying efficacy to the accrual method for the purpose of disallowing the deductions if the payments are not actually made, and at the same time of re-establishing the efficacy of the accrual method in order to disallow also the deductions when the payments are actually made.

Another pronouncement of the trial court challenged by the taxpayer in this Court deals with the reasonableness of the salaries of $32,000 annually paid in 1947 and 1948 to Dr. Mario Juliá as Medical Director of the taxpayer. In 1946, Dr. Juliá earned a salary of $12,000, but in 1947 and 1948 that salary was increased to $32,000 annually. On this point, the lower court made in part the following findings of fact:

"During the years in question, Dr. Mario Juliá held the position of Medical Director of plaintiff. As such, he lays down the rules on the types of treatment, selection of specialists, social, vocational, and rehabilitation work, supervises the other physicians and the entire personnel, and sees that the rules adopted on the matter are duly executed; he sees that the professional and institutional standing of the clinic is on the same footing as other institutions in the United States and abroad, to which end he must visit and has visited those institutions; he discusses with the medical staff the professional standards and their application, and, in general, is in charge of the administration of the institution in its professional as well as its economic aspects. As Medical Director, Dr. Juliá is the person directly in charge of the contracts involving veteran patients and makes the necessary contracts with the Veterans' Administration in Puerto Rico as well as in the United States.

"From 1943 to 1949, the income received by plaintiff from veteran patients increased from $167,396.75 in 1943, or 68.48 per cent of its gross income, to $602,715.36 in 1949, or 79.63 per cent of the total. The income from private patients increased from $75,441.66 in 1943 to $154,210.14 in 1949. From 1943 to 1949, plaintiff's aggregate income was $3,748,202.50, of which 74.36 per cent or $2,787,823.35 was derived from veteran patients and $955,616.37 from private patients, in addition to other income amounting to $4,762.78 [7-A]."

In its opinion the San Juan Court stated as follows:

"(3) In 1947 and 1948, Dr. Juliá held 50.48 per cent of plaintiff's stock. The trusts created by him for the benefit of his minor children owned an additional 48.10 per cent, totalling 98.58 per cent. In other words, 98.58 per cent of plaintiff's aggregate earnings was held by Dr. Juliá and his children.

"In 1946, Dr. Juliá received a salary of $12,000. Since this salary was fixed by the plaintiff and accepted by Dr. Juliá, both of whom realized the work performed by the latter, we must conclude that the salary was reasonable as respects both of them. The income from patients in 1946 totalled $578,739.16. Dr. Juliá's salary in that year in the sum of $12,000 therefore represented approximately .021 per cent of that income. In 1947, the income increased to $698,878.14, the increase being mainly from veteran patients. In 1948, the income increased to $733,044.78, the totality of that increase, except for $307, being from veterans.

"Although it is true that from 1946 to 1948 there was an increase in plaintiff's income, the main source of that income was from veteran patients, in which field plaintiff had no competition in Puerto Rico since it is the only private institution for the treatment of mental cases. Without overlooking the work performed by Dr. Juliá as Director of the clinic, it may be said that those increases were rather the natural result of the increase in veteran patients in 1946 as the soldiers of World War II were discharged and returned to Puerto Rico. On the other hand, it cannot be gainsaid that the income increase was

_____

[7-A] In 1946, plaintiff's income was $425,550.50 from veterans and $153,188.66 from other patients, totalling $578,739.16. In 1947, it was $526,829.77 from veterans and $172,048.37 from private patients, totalling $698,878.14. In 1948, it was $560,688.82 from veterans and $172,355.96 from private patients, totalling $733,044.48."

in direct relation to the increase in the number of patients and, hence, more work for Dr. Juliá. Assuming that Dr. Juliá's compensation in 1946 was reasonable for the plaintiff as well as for himself, and that that compensation represented .021 per cent of the income from patients, a compensation in an equal proportion for 1947 and 1948 would also be reasonable. In 1947, it would increase to slightly less than $15,000 and in 1948 to slightly over $15,000. The court concludes that plaintiff is entitled to deduct, as reasonable compensation for Dr. Juliá, the sums of $15,000 in 1947 and $15,000 in 1948. Any amount in excess would be equivalent to a payment of profits under the guise of salaries."

Dr. Juliá controlled a majority of the stock of the taxpaying entity. The burden of proof of reasonableness of the salaries in question was on the taxpayer, and a claim for salary deduction would be disallowed unless its reasonableness is proved. 4 Mertens 408, § 25.49; *Lydia E. Pinkham Medicine Co.* v. *Commissioner*, 128 F. 2d 986, 1st Cir.; *Sportwear Hosiery Mills* v. *Comm.*, 129 F. 2d 376. There being present a relationship of ownership of a majority of the stock, or there being involved a close or family corporation, the taxpayer must offer stronger proof of reasonableness than in other situations. *P. R. Ry., L. & P. Co.* v. *Buscaglia, Treas.*, 62 P.R.R. 572, 586. In those cases the salaries should be scrutinized with particular care to ascertain whether they are salaries in fact, or profit-sharing arrangements. *Sobrinos de Izquierdo* v. *Sancho Bonet*, 56 P.R.R. 173. Whether or not salaries paid by a corporation are reasonable, is a question of fact to be determined by the court of first instance, and its conclusion will not be altered unless the record fails to contain sufficient evidence to support it, *Buscaglia* v. *Tax Court*, 69 P.R.R. 477; *Casanovas & Cía.* v. *Soltero*, 61 P.R.R. 630, in which the ruling of the former Tax Court, based on a comparison of salaries with the volume of sales, was upheld.

Naturally, the reasonableness of salaries does not lend itself to mathematical formulas or to hard and fast rules, and

every case must stand or fall upon its own peculiar facts and circumstances. *Patton* v. *Comm.*, 168 F. 2d 28. However, there are several general criteria which serve as a guide-post, as, for example, the ratio of the payment to the gross income (as was done in this case), or to the net earnings or the volume of the business, the relationship of ownership or control of the stock and whether the compensation bears relation to the ownership of the stock or the amount of the distributed profits, the intrinsic nature of the services rendered and their quality, necessity, or indispensability, the merits and qualifications of the employee and his usefulness to the firm, and the effect of his services and efforts on the economic condition of the firm, the compensation paid in prior years for like services and the comparison with those paid by like enterprises for like services. *P. R. Ry. L. & P. Co.* v. *Buscaglia, supra; Buscaglia* v. *Tax Court*, 65 P.R.R. 339, 343; 4 Mertens 407, §§ 25.49 *et seq.*

The salaries paid in prior years are relevant though not a satisfactory guide, since they could have been inordinately low. 4 Mertens 422, § 25.59. But if the salaries, compared with prior years, are increased excessively without an adequate explanation for such increase and without any warranting facts, as for example, if the increase in taxpayer's income is not due especially to increased efforts and greater skill in management, or to any additional services of the employee, the increase would be unreasonable. 4 Mertens 422, footnote 45, and 1953 Supp. In this case, the previous salary of $12,000 was reasonable considering that it represented .021 per cent of the gross earnings together with the fact that the corporation involved is controlled by Dr. Juliá. Naturally, a fixed or exact percentage of the earnings cannot be established as a controlling factor. However, in this case .021 per cent of the gross earnings was evidently a reasonable salary. Indeed, in *P. R. Ry. L. & P. Co.* v. *Buscaglia, supra*, a compensation of 2½ per cent of the gross

earnings was considered reasonable. The salary of $12,000 paid to Dr. Juliá in 1944 represented 13 per cent of the net earnings. In view of the above, the salaries of $12,000 paid prior to 1947 were not unreasonably low and may serve as a basis for comparison. We must determine whether the increase from $12,000 to $32,000 was justified by the increase in the earnings for 1947 and 1948. The taxpayer's gross income in 1946 was $579,102.31, which in 1947 increased to $700,827.69, and in 1948 to $733,118.03. Admitting the merits and capacity of Dr. Juliá, the usefulness of his services to the taxpayer, and the increase in his work and in his range of responsibility resulting from the increase in the volume of business of plaintiff (for which the trial court admitted as reasonable an increase in his salary from $12,000 to $15,000 annually), nevertheless, a substantial proportion of the increases in income was the result of a substantial increase of war veteran patients, taxpayer's clinic being the only private clinic of its kind in Puerto Rico. If the increase in the volume of business is due mainly to the war demands, the allowance of reasonable compensation will not be based wholly upon the increase in the gross income. *Locke Mach. Co. v. Comm.*, 168 F. 2d 21, cited in Mertens, vol. 4, 1953 Supp., § 25.56, footnote 24; *Wood Roadmixer Co. v. Commissioner*, 8 T. C. 247, in which it is stated at pp. 254 and 255: "It is evident that the large volume of business done in 1941 was not due to any particular advertising program or unusual activities of petitioner's officers and employees, but primarily to the activity of the Government in constructing national defenses, which put petitioner's 'Roadmixer' in demand. It was that factor more than any other that attributed to the success of petitioner's business."

What the trial court did was to decide that the previous salaries of $12,000 were reasonable and that the same percentage should be applied to the gross income for subsequent years in order to provide an increase from $12,000 to $15,000.

We cannot say that the application of the same percentage of gross income to all the years is an absolute formula, valid for all cases, as for example, the inflation in recent years could warrant an increase in salaries. However, in view of the circumstances surrounding this case as to the source of the increase in business, the unique position of the taxpayer regarding the lack of competition and the fact that Dr. Juliá controlled a majority of the corporate stock and received the greater part of the net profits of the entity, we conclude that the conclusion of the court of first instance on the reasonableness of Dr. Juliá's salary is supported by the evidence and should not be set aside by this Court.

Both parties have appealed to us from the ruling of the San Juan Court on certain deductions of interest on indebtedness of the taxpayer, paid by the taxpayer to certain trusts created by Dr. Mario Juliá and his wife for the benefit of their two children. On December 26, 1945, Dr. Mario Juliá and his wife set up a trust in favor of their two children who were then under 21 years of age. Ramón Collazo was appointed trustee with full power of administration and reinvestment. During the life of the trust, the *cestui que* trust or beneficiaries would each receive annually 25 per cent *of the net income* from the funds in trust, without exceeding $2,400 each. The remainder of the profits could be reinvested. In January 1949, the trustee was to deliver to beneficiary María Lina Juliá, upon attaining majority, the entire profits accumulated up to December 31, 1948. In January 1950, the trustee was to deliver to beneficiary Luis Esteban Juliá, upon attaining majority, the entire profits accumulated up to December 31, 1949. Five years later, in each case the trustee was to deliver the entire trust, including profits, to each beneficiary. The trustee, in representation of the trust, loaned the sum of $70,000 to the taxpayer at 5 per cent interest per annum. As a result of that loan, the taxpayer paid to the trustee certain amounts

of interest in 1946, 1947, and 1948, to wit: $2,673.60 in 1946, $3,500 in 1947, and $3,500 in 1948. The question at issue is the deductibility of such interest by the taxpayer. It is well to note that during the years 1946 to 1948, Dr. Juliá and his wife owned 106 out of the 210 shares issued by the taxpayer, or 50.48 per cent of the entire stock. The trustee of the trusts mentioned owned 101 shares, there being three other persons owners of one share apiece, making up 210 shares. The San Juan Court held that the beneficiaries were entitled to receive 25 per cent of the interest payments made to the trustee, whereby they would receive a taxable income as to such 25 per cent; that that 25 per cent was also income of Dr. Juliá and his wife by virtue of the legal usufruct which they had over the income of their minor children (*Cf. Hernández* v. *Tax Court*, 73 P.R.R. 659), and that, in view of the fact that Dr. Juliá and his wife owned more than 50 per cent of the stock of the corporation, that 25 per cent of the interest which the parents had the right to receive was not deductible under the provisions of § 32 (a) (2) of our Income Tax Act, as amended by Act No. 107 of May 12, 1943 (Sess. Laws, p. 302), to the effect that interest shall not be deductible when payable between a corporation and an individual, when the individual owns or controls, directly or indirectly, or through his family, more than 50 per cent of the value of the outstanding stock of the corporation. This section further provides that an individual shall be considered as the owner of the stock belonging, directly or indirectly, to his family. The taxpayer has challenged in this Court the decision of the lower court disallowing a deduction in respect to the 25 per cent of such interest. In his appeal, the Secretary of the Treasury contends that the totality, and not merely 25 per cent of the interest paid, should be disallowed as a deduction.

Let us turn first to the question raised by the Secretary of the Treasury that no part of the interest paid should be con-

sidered deductible, His contention is that the capital of the trust was controlled by the minor beneficiaries; that by virtue of the *patria potestas* over their children, Dr. Juliá and his wife controlled the trust indirectly; that the interest paid by the corporation to the trust was therefore interest paid indirectly to Dr. Juliá and his wife, and that, therefore, in view of the control of the corporation by the Juliá spouses, such interest was not deductible since it had been paid indirectly to persons who owned more than 50 per cent of the corporate stock. Irrespective of the fact that the structure created by the contention of the Secretary of the Treasury may involve elements too remote, indirect, and complex to warrant the complete disallowance of the deductions, such contention is not supported by our Income Tax Act. It is helpful to consider anew, as pivotal point of reference, the Federal Income Tax Act. Section 301 of the Federal Act of 1937 (after which our 1941 Act was patterned) amended § 24(a) of the 1936 Act (Seidman, *Legislative History of Federal Income Tax Laws*, pp. 201, 198, 199) in order to provide, in part, that no deduction shall be allowed in respect to interest accrued (1) if not paid within the taxable year or within 2½ months after the close thereof, (2) if the method used by the creditor is the *cash* basis, and (3) if the taxpayer and the creditor are persons between whom losses would be disallowed under § 24(b). Section 24 provides, in part, that no deduction shall be allowed in respect to sales or exchanges between a corporation and an individual, or between two corporations, where the relationship of control of a majority of the stock is present, *between the creator or grantor of a trust and the trustee*, between the trustee of one trust and the trustee of another trust, if both have been created by the same grantor, and *between the trustee of a trust and the beneficiary of such trust*. It is further provided that, for the purpose of determining the ownership of stock, (a) stock owned, directly or indirectly, by a corporation, partnership,

estate, or *trust*, shall be considered as being owned by the shareholders, partners, or *beneficiaries;* (b) an individual shall be considered as owning the stock owned, directly or indirectly, by his family . . . (e) that for the purpose of converting constructive ownership into actual ownership, stock constructively owned by a person under such subparagraph (a) (by the stockholder or beneficiary of a trust by reason of the fact that the shares belong to a corporation or a trust), shall be treated as actually owned by such stockholder or beneficiary, such rule of identification of the constructive ownership with the actual ownership not being applicable to other situations mentioned in § 24. By virtue of those statutory provisions, it has been noted, in correlating the various rules of constructive ownership, that stock constructively owned by an individual as the shareholder, partner, or *beneficiary* of a corporation, partnership, or *trust*, is deemed to be actually owned by such individual for the purpose of putting still another person in the position of constructive owner. 5 Mertens 236, 237, § 28.49.

We need not decide whether the provisions cited from the Federal Act support defendant's contention. When our basic Income Tax Act was amended in 1941 by Act No. 31 of April 12, 1941 (Sess. Laws, p. 478), several innovations contained in the 1937 Federal Act were adopted. However, the sections relating to interest deductions (§§ 16 (2) and 32 (a) (2), the latter subparagraph having been amended by Act No. 107 of May 12, 1943), do not include any provision prohibiting interest deductions whenever a trust is involved, nor any provision establishing the concept of constructive ownership in cases involving a trust. Section 32 (a) (2), as amended by Act No. 107 of May 12, 1943, provides as follows:

"(2) All interest paid or accrued within the taxable year on its indebtedness, except on indebtedness incurred or continued to purchase or carry obligations or securities (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon

which is wholly exempt from taxation under this title. *Provided,* That interest shall not be deductible when payable between an individual and a corporation or partnership, nor the interests, payable between a corporation or partnership and an individual, when the individual owns or controls, directly or indirectly, or through his family, more than fifty (50) per cent of the value of the outstanding stock of the corporation or more than fifty (50) per cent of the social capital, or between two corporations when one of them owns or controls more than fifty (50) per cent of the outstanding stock of the other corporation, or between two partnerships, when one of them owns or controls more than fifty (50) per cent of the social capital of the other, or between a partnership and a corporation when said corporation owns or controls more than fifty (50) per cent of the social capital of the former, or between a corporation and a partnership when said partnership owns or controls more than fifty (50) per cent of the outstanding stock of said corporation. The same definitions of the term family, corporation, and partnership contained in this Act shall be applicable for the purposes of this section."

The disallowance of interest deduction is confined to a case of relationship of control of a corporation or partnership, without including in such prohibition trust cases, which are expressly covered by the Federal Act. Neither were there included in our Act the express provisions of the Federal Act bearing on constructive ownership of a trust by a beneficiary, and by a third person through the constructive ownership of the beneficiary. By analogy, our § 32(a)(4), relating to deduction for losses, provides that "for the purposes of all the subdivisions of this section, an individual shall be considered as the owner of the shares of stock directly or indirectly belonging to his family, it being understood, for the purposes of this section, that family means the relatives up to the fourth degree of consaguinity or affinity." Assuming the applicability of this last provision to interest deduction, it is well to note that this provision is included in the Federal Act. But that Act also includes other categories of constructive ownership, including cases of trusts, which were not

included in our Act. The failure of our legislature to include cases involving trusts in the prohibited interest deductions, and the omission of the concept of constructive ownership in respect of trusts, is an eloquent demonstration that it was not the legislative intent to reject interest deductions solely because of the fact that the interest is paid to a beneficiary or trustee. In any event, our statute does not include trust in the prohibition of interest deduction. Not being included in the prohibition, they should be deductible, otherwise this Court would transcend its judicial function in including in the rejection of interest deductions a case which has not been included in the prohibition by the legislature. *Community of the Heirs of Fajardo* v. *Tax Court, supra.*

By analogy, the case of *Charles B. Bohn* v. *Commissioner of Internal Revenue*, 43 B.T.A. 953, 956, is applicable here. In that case the Commissioner of Internal Revenue alleged that a loss from a sale of stock between the settlor or constituent of a trust and the trustee was not deductible. The sale was executed under the 1934 Internal Revenue Act, § 24 (a) (6) of which provided in part as follows:

"In computing net income no deduction shall in any case be allowed in respect of . . . (6) Loss from sales or exchanges of property, directly or indirectly, (A) between members of a family . . . For the purpose of this paragraph . . .the family of an individual shall include only his brothers and sisters, . . . spouse, ancestors, and lineal descendants."

The Board of Tax Appeals stated, in part, as follows:

"It will be noted that the statute does not expressly mention sales between the settlor and the fiduciary of a trust. Our inquiry is whether an intent to cover the transaction now at issue may be spelled out of the words 'directly or indirectly', and we are entitled, in the face of such ambiguity or doubtfulness of meaning, to consider the legislative history of the section. *Caminetti* v. *United States*, 242 U. S. 470; *Penn Mutual Life Insurance Co.* v. *Lederer*, 252 U. S. 523.

"We have already held this statutory provision to be ambiguous, and that the legislative history of the section here pertinent is not helpful. *Shelden Land Co.*, 42 B.T.A. 498. It is

there stated merely that the general purpose of the section is to disallow losses on sales between members of a family because sales of that type have frequently been used to avoid income taxes. Light is cast on the problem, however, by considering the provisions and history of section 301(a) of the Revenue Act of 1937, which amended section 24(a)(6) by adding thereto a sentence forbidding the deduction of losses on sales between the settlor and fiduciary of a trust . . .

"It seems to us that the reasonable inference to be drawn from the amendment of the section and the above statement is that transactions of the type at bar were not covered by the 1934 Act. The sale here was not between father and daughter, but between father and trustee for daughter. The daughter would not come into full legal possession of the stock until the termination of the trust, and even then her estate might be defeated by her prior decease. No powers over the trust corpus were retained by petitioner, hence rendering inapposite *Helvering* v. *Clifford,* 309 U. S. 331. To hold that the transaction falls within section 24(a)(6) is to read something into an ambiguous statute which is not there, in an attempted clarification *ad hoc.*

"Respondent, citing *Higgins* v. *Smith,* 308 U. S. 473, urges that section 301 of the 1937 Act only clarified and extended the existing rule. This statement is, of course, refuted by the above quoted committee report, which remarks that *new* restrictions are being added to *inadequate* existing law. We hold that petitioner is entitled to the deduction claimed."

The Secretary of the Treasury alleges that the Juliá spouses controlled the corporation as well as the trusts, and that the latter could therefore serve as instrument for tax evasion or reduction through the corporate declaration of dividend distribution for the benefit of the trusts. There are some circumstances under which, for income-tax purposes, the existence and legal capacity of a trust are disregarded and the settlor or constituent of the trust is treated as the actual owner of the properties and of the income from the trust, notwithstanding the trust. In *Helvering* v. *Clifford, supra,* a husband set up a trust and declared himself trustee. The income was payable to the wife, but the husband retained the right to accumulate the income and maintained complete

control of the corpus as to its administration, investment, and reinvestment. The corpus was to go to the husband on termination of the trust. It was held that, notwithstanding the trust, the husband continued to own the income from the trust, which was taxable income of the husband. The circumstances of that case are not present in the case at bar. Here the trusts are irrevocable, and the Juliá spouses did not reserve any power or control over any of the properties of the trust, or over their administration, investment, or reinvestment. The corpus and the income did not revert to them upon termination of the trust but rather would be delivered to the beneficiaries. The case of *Belaval* v. *Court of Eminent Domain*, 71 P.R.R. 246, in which it was held that the trustee and not the beneficiaries of a trust was the owner of the income from the trust, is in point.

When the trusts were constituted it was provided that 25 per cent of the net annual income would be delivered annually to the beneficiary. The lower court held that, under that provision, 25 per cent of the interest paid to the trusts was not deductible, since that percentage was actually paid to the Juliá spouses as legal usufruct on the minor's income, and they controlled more than 50 per cent of the stock of the corporation which had paid the interest. The San Juan Court committed error, since it was not shown that the interest so paid *to the trusts* had been paid to the beneficiaries as part of their net income, that is to say, that 25 per cent of the interest was not identified as part of the annual *net* income *of the beneficiaries.* In other words, the record does not show that the 25 per cent of the interest coincided with or was a part of the 25 per cent of the annual net income of the trusts. The interest was part of the gross income of the trusts, but in order to show that the parents had received 25 per cent of the interest by virtue of their legal usufruct of the income of their children, it was necessary to show that the children had actually received that 25 per cent as one fourth of the

net income of the trusts, or as part of 25 per cent of the net income of the trusts. The judgment appealed from must be modified in order to recognize the deductibility of the whole of the interest in dispute.

 The taxpayer contends that the 1943 tax has prescribed on the ground that the seven-year period provided in § 60(a) of the Income Tax Act has expired without the taxpayer validly waiving the plea of prescription. On this point, the trial court stated as follows:

"Plaintiff's 1943 income tax return was filed on May 15, 1944. On September 12, 1950, plaintiff was notified of the tentative deficiencies for 1943, an administrative hearing having been requested on October 9, 1950. On April 13, 1951, the defendant advised plaintiff that in order to avoid the assessment of the 1943 deficiency in the manner provided in § 57(c) of the Act, it was necessary to execute and file a document waiving the period of limitation. Some time in April the taxpayers signed and filed in the Department of the Treasury a document waiving all the legal effects of the seven-year period of limitation provided by § 60(a)(1) of the Act in respect to its income return for the taxable year ending on December 31, 1943, it having been agreed that any tax deficiency resulting from that income return could be assessed at any time on or before May 31, 1952. On August 9, 1951, the defendant notified plaintiff of the deficiencies for 1943 to 1948, adding a footnote stating that this notice sets aside the notice served on September 12, 1950. The final deficiency was notified on September 14, 1951.

"Since the 1943 income return was filed on May 15, 1944, the seven-year period of limitation would expire on May 15, 1951. Before expiration, plaintiff waived such prescription but on the ground that the tax could not be assessed after May 31, 1952. The final deficiency was notified on September 14, 1951, or prior to May 31, 1952. The situation is prima facie clear in that the 1943 tax did not prescribe.

"Plaintiff contends, however, that it waived the period of limitation only as respects the tentative notice of September 12, 1950 and not as respects the notice of August 9, 1951, and that since by disposition of the defendant this notice of August 9, 1951 [set aside the former] there was no waiver of limitation in force when the final deficiency was notified.

"Plaintiff is not correct. According to the text of the document signed by it, it waived the period of limitation in respect to its 1943 income tax return and not in respect to any particular notice of tentative deficiencies. In the process of determining the income tax which by law a taxpayer is bound to pay for a given year, there may be one or several interlocutory notices of deficiencies until a final notice is reached. But the tax finally assessed and levied is not in relation to any tentative notice in particular, but in relation to the taxable year involved. As already stated, the taxpayer expressly waived the period of limitation in connection with the taxable year 1943. We must therefore conclude that the special defense of prescription set up by the taxpayer for that year does not lie."

Plaintiff's income return for the taxable year 1943 was filed on May 15, 1944. Under § 60 (a) of the Income Tax Act, the period of limitation to notify and assess the tax in the instant case expired on May 15, 1951. Section 61 (b), however, provides that "Where both the Treasurer and the taxpayer have consented in writing to the assessment of the tax after the time prescribed in § 60 for its assessment, the tax may be assessed at any time prior to the expiration of the period agreed upon."

The waiver through the agreement mentioned in § 61 (b) should be governed, as to its scope and legal consequences, by the very terms of the agreement. *Buscaglia* v. *Tax Court,* 67 P.R.R. 650. In this case the agreement provides, in part, that the taxpayer "waives, *for all legal purposes*, the seven-year prescriptive period provided by § 60 (a) (1) of the Act *in respect of its income return* for the taxable year ending on December 31, 1943, it being agreed that *any deficiency* in the income tax *resulting* under the Act in force *in connection with the aforesaid income return* may be assessed at any time on or before May 31, 1953 (*sic*)." (Italics ours.)

The terms of the agreement are absolute, the waiver being applicable to any deficiency resulting in connection with the entire tax which may be owing in 1943. The waiver is not

confined to the deficiencies already notified, but was applicable, according to its terms, to any additional or subsequent deficiency which might be notified, i. e., resulting from the income-tax return. The lower court acted correctly in holding that the 1943 tax had not prescribed.

In *Emily Marx* v. *Commissioner*, 13 T. C. 1099, 1105, the waiver of prescription provided that the period of assessment was extended for all purposes. It was held that a subsequent addition to the tax imposed by virtue of a credit disallowance was part of the tax and was covered by the waiver agreement.

The judgment appealed from will be modified so as to allow as deductions the entire amount of interest paid by the taxpayer to the trusts, and, as thus modified, the judgment will be affirmed.

Mr. Justice Sifre took no part herein.

———————

## ON RECONSIDERATION
### June 23, 1954

Opinion of the Court delivered by Mr. Justice Ortiz.

The taxpayer urges this Court to reconsider its ruling on the reasonableness of the salaries paid in 1947 and 1948 to Dr. Mario Juliá as Medical Director of the taxpaying entity, for the purpose of their deductibility by the taxpayer. We ratify the general views expressed in our original opinion on the relevant factors which should be considered in order to formulate a decision on the reasonableness of the salaries, as a basis for their deduction. However, after a re-examination of the question raised we have reached the conclusion that the taxpayer is correct in its contention that the salaries paid to Dr. Juliá were altogether reasonable. In our original opinion we did not attach due importance to two factors which are actually controlling in this case. We refer to the compensation paid to the other physicians who worked in the Clínica Juliá as compared with the salary

paid to the Medical Director of the institution, and also to the reality of the inflation in the living standard prevailing in Puerto Rico.

It appears from the record that four physicians who worked in the Clínica Juliá during the years in dispute earned $29,500 each in 1947 and $23,999 each in 1948. Considering separately the value of the services of Dr. Juliá as Medical Director, and also as compared with the value of the services of the other physicians under his direction, the $32,000 salary for the years in question is altogether reasonable if we bear in mind the value of the dollar during those years.

It is necessary to discuss two peculiar aspects of this case, namely, that Dr. Juliá controls more than 50 per cent of the stock of the taxpaying entity and that the compensation of the other four physicians was fixed on the basis of the formula that each one of them was to receive one fourth of 45 per cent of taxpayer's net income. The rule that the salary of the director is reasonable because of the mere fact that it is higher than that of his subordinates, cannot be accepted as absolute and strictly applicable to all cases. The compensation received by the employees might be excessive, and that could imply that the higher salary of the director could be so unreasonably high as to represent a distribution of profits and not the payment of a reasonable salary, in a situation in which the director controls a majority of the stock. However, the reasonableness of the salaries paid to the four physicians has not been challenged in the case at bar and, as a matter of fact, those salaries and the salary of $32,000 paid to Dr. Juliá were altogether reasonable. It does not appear from the record that in the instant case the salaries were fixed or handled artificially in order to conceal a distribution of profits under the guise of salaries. What happened was simply that the Medical Director of the institution was paid a higher salary than the other four physi-

cians, and both the latter's salaries and the compensation paid to Dr. Juliá were reasonable.

Our previous judgment will be reconsidered and modified in the sense that the judgment of the court of first instance be modified in order to allow the deduction of the $32,000 salaries paid to Dr. Mario Juliá in each of the years 1947 and 1948.

Mr. Justice Belaval concurs in the result.

Mr. Justice Pérez Pimentel dissented.

Mr. Justice Sifre took no part in the decision of the case.

---

### ON MOTION FOR RECONSIDERATION
#### August 3, 1954

On June 23, 1954, at the taxpayer's request, we reconsidered our original opinion and held that the $32,000 annual salary paid to Dr. Juliá was reasonable. Thereafter, the Secretary of the Treasury filed a motion for reconsideration alleging that (1) we erred in reconsidering our original ruling as to the reasonableness of the salary paid to Dr. Juliá, and urging that (2) we reconsider that part of our original opinion in which we held that the 25% of the interest paid by the taxpayer to the trusts established by Dr. Juliá for the benefit of his children was deductible.

Upon re-examination of the question raised on the reasonableness of the salary paid to Dr. Juliá, we ratify our view in our former opinion on reconsideration in the sense that the salary of $32,000 received by Dr. Juliá was reasonable. As to the deductibility of 25 per cent of the interest in question, we held in our original opinion that it was deductible, since it had not been established or proved that 25 per cent of such interest had been included in the 25 per cent of the net income of the trusts to which Dr. Juliá's children were entitled as beneficiaries thereunder, and that, therefore, Dr. Juliá had not constructively received such interest. The

Secretary of the Treasury contends that that question was not raised in the lower court, nor was any evidence offered on that point, wherefore the case should be remanded to the San Juan Court for decision of that question in the first instance, and that in any event the burden of proof falls upon the taxpayer to show that the 25 per cent of the interest paid was not included in the 25 per cent of the net income from the trusts.

We need not pass on the allegations of the Secretary of the Treasury since, from a point of view other than that expressed in our original opinion, the result must be the same, that is, that 25 per cent of the interest paid to the trusts is deductible. Section 32 (a) (2) of the Income Tax Act (as amended by Act No. 107 of May 12, 1943, Sess. Laws, p. 302), provides in part that all interest paid (by a corporation) on its indebtedness shall be deductible, but that interest payable (or paid, *Cf. Buscaglia, Treas.* v. *Tax Court*, 67 P.R.R. 548) by an individual to a corporation, or vice versa, shall not be deductible where the individual owns or controls more than 50 per cent of the value of the outstanding stock of the corporation, or between two corporations where one of them owns or controls more than 50 per cent of the outstanding stock of the other corporation. The legislative intent was, among others, to cover the case where a corporation was indebted to an individual who controlled a majority of the corporate stock. In the case at bar, the indebtedness of the corporation was not in favor of Dr. Juliá or his wife. The obligations were contracted in favor of certain trusts. As stated in our original opinion, contrary to the federal law which expressly includes trusts in those categories in which no interest is deductible, whenever there exists the relation of control, our law does not include trusts; in other words, it is not provided that interest shall not be deductible on any indebtedness which may exist in favor of a trust whenever there exists the relation of direct or in-

direct control. Interest payable to trusts comes within the general rule of deductibility of interest established in § 32(a)(2), since it is not included in the exceptions enumerated in that Section.

It might be argued that trusts may serve as a means to evade taxes and as a vehicle of artificial deductions. However, the legislature did not elect to close that possible avenue of escape in § 32(a)(2). An argument could also be advanced to the effect that, dispensing with all discussion on trusts, as a question of reality, the interest in this case was paid to the minor children of Dr. Juliá and his wife, and, hence, it was income of the spouses by virtue of their legal usufruct on the income of their children. But the question before us concerns interest deductible by the corporation and not taxable income of Dr. Juliá and his wife. The fact that they received such income does not foreclose the reality that no debt existed between the corporation and Mr. and Mrs. Juliá.

The motion for reconsideration filed by the Secretary of the Treasury will be denied.